FILED

DEC 08 2006

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ALAN CLYDE STEELE, | ) | CIV. 06-4001-RHB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| DOUGLAS WEBER, Warden, South | ) | |
| Dakota State Penitentiary, in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is defendant Douglas Weber's motion for summary judgment based on qualified immunity and the merits of this matter. For the reasons set forth below, the motion for summary judgment is granted.

I. **BACKGROUND**

A. **Facts Regarding Denial of Narcotic Pain Medication Claim**

Defendant Douglas Weber is the warden of the South Dakota State Penitentiary, located in Sioux Falls, South Dakota. (Def.'s Statement of Undisputed Material Facts ("DSUMF") at 1.) Since July 28, 2005, plaintiff Alan Clyde Steele has been an inmate in the custody of the South Dakota Department of Corrections, serving a six-year sentence for the crime of felony possession of a controlled substance. (Id. at 1-2.)

Prior to his incarceration, plaintiff suffered an injury at work, whereby his left forearm was crushed. (Pl.'s Statement of Material Facts ("PSMF") Ex. C (letter from Donald W. Burnap M.D.).) This injury resulted in a long-standing intractable pain disorder, specifically diagnosed

as Complex Regional Pain Syndrome Type I. (Id.) To treat plaintiff's pain condition he was prescribed high-dose narcotic pain medications by Donald W. Burnap, M.D., a board certified doctor in psychiatry and in the sub-specialty of pain medicine. (Id.)

On July 25, 2005, plaintiff pleaded guilty to his crime and received a sentence of imprisonment to be served at the South Dakota State Penitentiary. (DSUMF at 2.) Pursuant to his criminal judgment, the penitentiary was directed to comply, "to the extent possible," "with the pain management regime which has been prescribed by" plaintiff's physician. (PSMF Ex. C (amended judgment).) On the day of his arrival at the penitentiary, July 28, 2005, plaintiff was in possession of a prescription bottle containing morphine sulfate tabs, a narcotic pain reliever. (DSUMF at 3.) Prison staff members obtained plaintiff's prescription and called Eugene R. Regier, M.D., a doctor employed by the South Dakota Department of Health who provides medical care services to inmates at the penitentiary. (Id.) Dr. Regier instructed the prison staff members to withhold the administration of plaintiff's prescription until after plaintiff's admission physical. (Id.) Plaintiff was placed in the prison's infirmary so prison staff could observe plaintiff for withdrawal symptoms or problems. (Eugene R. Regier, M.D.'s Aff. at 2; PSMF at 15.) To assist plaintiff with his pain and detoxification symptomatology upon admission into the penitentiary, he was provided ibuprofen and Valium. (DSUMF Ex. B.)

The following day, on July 29, 2005, Dr. Regier conducted an admission physical of plaintiff. (DSUMF at 3.) During the physical, plaintiff admitted to a history of substance abuse, which included cocaine, methamphetamine, marijuana, and alcohol. (Id.) Dr. Regier and plaintiff discussed the use of other non-narcotic medications to manage the pain. (Id.) Dr. Regier also noted that plaintiff's prior prescription contained an unusually high dose of narcotic

pain medication. (Id. at 4.) At the conclusion of the physical, Dr. Regier prescribed Cymbalta, a non-narcotic pain reliever, although plaintiff was skeptical of any medication other than the prescribed narcotics. (Id. at 3.)

On August 3, 2005, Dr. Regier checked on plaintiff while he was in the infirmary. (DSUMF at 3-4; Dr. Regier's Aff. at 2.) According to Dr. Regier's observations, plaintiff demonstrated very little in the way of significant withdrawal problems. (Dr. Regier's Aff. at 2; DSUMF Ex. B.) At that time, plaintiff informed Dr. Regier that he had unilaterally decided to discontinue using the Cymbalta after three doses (Dr. Regier's Aff. at 2; DSUMF Ex. B.), because, as plaintiff claims, it caused him to experience "nervous" side effects (DSUMF Ex. B; PSMF at 5). As a substitute, Dr. Regier prescribed another non-narcotic pain reliever, Amitriptyline, which plaintiff requested and indicated he had taken before. (DSUMF at 4.)

On August 29, 2005, plaintiff met with Herbert Saloum, M.D., who also has provided medical care services to inmates. (Herbert Saloum's Aff. at 1.) He, too, noted that plaintiff's previous narcotic prescriptions were comprised of "exorbitant" and "tremendously high" dosages. (Id. at 2; DSUMF Ex. B.) Dr. Saloum, like Dr. Regier, prescribed plaintiff a non-narcotic pain reliever, Neurontin, and referred plaintiff's case to Jeffrey Luther, M.D. (Dr. Saloum's Aff. at 2.) Dr. Luther, the medical director for correctional health care, directed plaintiff to an anesthesiologist, Scott Lockwood, M.D., for further evaluations and treatment. (DSUMF at 5.)

On September 19, 2005, however, Dr. Saloum discontinued plaintiff's Neurontin prescription after learning that plaintiff had been refusing to take the medication for over two weeks. (Id.) Plaintiff felt that the Neurontin was doing nothing for his chronic pain. (Id. at Ex.

B.) Plaintiff also expressed concern about taking Tylenol due to his history of Hepatitis C. (Id.) To quell this concern, Dr. Saloum conducted a liver profile and concluded that plaintiff's Tylenol dose was of no significance. (Id.) Plaintiff's comprehensive panel placed him within normal limits. (Id.) Dr. Saloum nevertheless ceased plaintiff's Tylenol prescription to alleviate his concerns. (Id.)

With Dr. Lockwood, plaintiff underwent a stellate ganglion block. (Id.) Plaintiff reported to Dr. Saloum on October 31, 2005, that the consultation and treatment were ineffective and that the only thing that could help him was narcotics. (Id.) At that juncture, plaintiff was taking ibuprofen. (DSUMF at 6.) On November 23, 2005, Dr. Saloum prescribed plaintiff Tylenol Extra Strength and Motrin, even though plaintiff remained unsatisfied with this regime. (Id.)

Dr. Luther examined plaintiff on February 13, 2006, to assess his medical condition and address his continual requests for narcotic medications. (Id.) After a battery of tests, Dr. Luther opined that plaintiff showed no evidence of dystrophic changes and demonstrated a good range of motion. (Id.) He also noted that plaintiff's previous narcotic prescription was excessive. (Id.) Through his observations, Dr. Luther concluded that a prescription for narcotic pain medications would be medically unnecessary in plaintiff's case. (Id.)

On April 12, 2006, plaintiff was examined by a neurologist for a nerve-conduction study on both arms. (Id.) Plaintiff met with Dr. Saloum on April 17, 2006, to review the study and implement the recommendation that plaintiff start taking another non-narcotic drug, Azipramine. (Id.) Following his visit with Dr. Saloum, plaintiff was prescribed both Azipramine and Lyrica, another non-narcotic medication. (Id. at 7.) However, on May 8, 2006, plaintiff informed Dr.

4

Saloum again that neither drug was working and refused to allow Dr. Saloum to evaluate him. (Id.) Dr. Saloum subsequently agreed with plaintiff to stop prescribing those medications. (Id.)

Upon admission, plaintiff informally complained to prison staff regarding the denial of his narcotic pain medications. (See Compl. Attach. 1A.) In compliance with prison policy and federal law, plaintiff then filed requests for administrative remedies regarding his prescriptions on August 17, 2005, and November 23, 2005. (Douglas Weber's Aff. Ex. A; Doug Wynia's Aff. at 2.) As his first request, plaintiff asserted that he wanted to resume with his chronic pain regime; in his second, plaintiff sought an examination by a specialist. (Wynia's Aff. Ex. B & Ex. C.) Plaintiff's requests were respectively denied on August 23, 2006, and December 12, 2005, stating, in part, that the decision to withhold plaintiff's narcotic prescriptions "was based on the advice and judgment of medical personnel," (Weber's aff. ex. A.), and that plaintiff refused treatment by a specialist at the time such services were offered, (Wynia's aff. ex. C).

### B.  Facts Regarding Confiscation of Inmate Account Funds Claim

The South Dakota Department of Corrections promulgated the "Inmate Accounts and Financial Responsibility" policy ("account policy") to govern inmate banking. (Timothy Symes's Aff. at 1-2, Ex. A.; DSUMF at 8.) Pursuant to South Dakota law, the Department of Corrections' account policy restricts an inmate's ability to spend money within the custodial institution. (Symes's Aff. Ex. A.) The account policy allows an inmate to accumulate $140.00 in the inmate's commissary account during a twenty-eight day period. (Id.) The inmate may spend up to $35.00 per week from the commissary account for expenses incurred in the commissary. (Id.) Any amount exceeding the initial $140.00 is divided evenly between the inmate's savings and disbursement accounts. (Id.) Funds in the disbursement account are

applied toward an inmate's fines, restitution, or other financial obligations. (Id.) If no such obligations exist, disbursement account funds are then applied to defray the inmate's cost of incarceration. (Id.) Prior to spending money from the savings account, the inmate must amass a balance of $100.00, which is frozen. (Id.) The inmate may maintain a $250.00 savings account balance and spend those funds within the institution. (Id.) As such, $350.00 is the maximum savings account balance; that is, $100.00 that is frozen and $250.00 that is spendable savings. (Id.) Any amount over $350.00 in the savings account is applied toward the disbursement account. (Id.) Once all obligations are satisfied from the disbursement account, the monies are accumulated in the inmate's frozen account. (Id.)

In addition to the account policy, the Department of Corrections enacted procedures that inmates must follow in order to submit a grievance or complaint. (Wynia's Aff. Ex. A.) Under these procedures, inmates must first attempt to resolve a grievance informally through an informal resolution request, setting forth the perceived problem and requested remedy. (DSUMF at 9.) Prison staff must respond to an inmate's informal resolution request within five working days. (Id.) If an inmate is displeased with the response, a request for an administrative remedy must then be submitted by the inmate. (Id.) The warden of the prison faculty must respond to an administrative remedy request. (Wynia's Aff. Ex. A.)

Plaintiff has been subjected to the account policy since arriving at the penitentiary and his funds have been disbursed from his institutional account. (Answer at 2.) Plaintiff maintains that he was not notified of the Department of Corrections' account policy. (PSMF at 15-16.) Upon realizing that his funds were being diverted to pay for his obligations, plaintiff was informed by prison staff members to file a grievance. (Id. at 16.) The staff subsequently supplied plaintiff

with a grievance form. (Id.) On October 24 and November 30, 2005, plaintiff submitted informal resolution requests regarding the alleged misappropriation of his funds, (Wynia's aff. ex. D & ex. E.), but he never presented his grievance through a request for an administrative remedy, (DSUMF at 9; Wynia's aff. 2-3, ex. D & ex. E).

### C.      Procedural History

On January 3, 2006, plaintiff filed a civil rights action under 42 U.S.C. § 1983, alleging three causes of action and seeking damages, injunctive relief, and declaratory relief. On that same date, plaintiff moved to proceed *in forma pauperis*. On April 6, 2006, following the Court's screening procedure, plaintiff's motion for *in forma pauperis* status was granted, but one of plaintiff's claims was dismissed for failing to state a claim upon which relief may be granted. Defendant Weber filed an answer to plaintiff's complaint on April 19, 2006, and on April 20, 2006, the Court entered an order staying discovery until the resolution of the affirmative defense of qualified immunity. On June 1, 2006, defendant Weber moved for summary judgment, which was accompanied by numerous affidavits, exhibits, and a statement of facts. Plaintiff responded to these pleadings on June 21, 2006, and a reply was filed on June 30, 2006.

### II.     STANDARD OF REVIEW

"Summary judgment is proper if, viewing the record in the light most favorable to [plaintiff], there is no genuine issue of material fact" and defendant Weber is "entitled to judgment as a matter of law." Myers v. Richard County, 429 F.3d 740, 750 (8th Cir. 2005) (citing Fed. R. Civ. P. 56(c) (1987)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). As such, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Id. at 247-48, 106 S. Ct. at 2510 (emphasis in original). "There is no genuine issue of material fact if the evidence is such that no reasonable jury could return a verdict for [plaintiff]." Robinson v. White County, Ark., 452 F.3d 706, 709 (8th Cir. 2006) (following Anderson, 477 U.S. at 248, 106 S. Ct. 2510). Initially, "[t]he party moving for summary judgment has the burden of proof to show there is no genuine issue of material fact." Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 783 (8th Cir. 2006) (adhering to Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Once the moving party satisfies this burden, however, the non-moving party bears an affirmative burden "to go beyond the pleadings and, by affidavit or otherwise, produce specific facts that show that there is a genuine issue for trial." Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005); Fed. R. Civ. P. 56(e). See Simpson v. Des Moines Water Works, 425 F.3d 538, 541-42 (8th Cir. 2005).

### III. DISCUSSION

#### A. Qualified Immunity

"Qualified immunity protects a government official from liability in a § 1983 claim unless his or her conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known." Pool v. Sebastian County, 418 F.3d 934, 942 (8th Cir. 2005) (citing Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002)). There are two steps when analyzing qualified immunity issues. The first inquiry is whether plaintiff's asserted facts show the official's conduct violated a statutory or constitutional right. Saucier v. Katz, 533 U.S. 194,

8

201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001); Wright v. Rolette County, 417 F.3d 879, 884 (8th Cir. 2005). If the answer to the initial query is no, the Court will grant qualified immunity. Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. If yes, the Court must then address the second inquiry of "whether the right was clearly established," Id.; that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," Id. at 202, 121 S. Ct. at 2156. See Wilson v. Layne, 526 U.S. 603, 615, 119 S. Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999).

**B.      Deliberate Indifference:  Denial of Narcotic Pain Medication**

Defendant Weber argues, in support of qualified immunity and summary judgment, that plaintiff's first cause of action merely states a disagreement with his medical care, which is insufficient to establish constitutional violation under the deliberate indifference standard. Opposing the motion for summary judgment, plaintiff contends that defendant Weber and his prison staff were deliberately indifferent to plaintiff's serious medical needs. Because the South Dakota Department of Corrections maintains and implements a policy that prohibits him from using the narcotic pain relievers prescribed by Dr. Burnap, plaintiff argues that defendant Weber's motion for summary judgment should be denied on that basis alone. Specifically, plaintiff asserts that since his incarceration, he has been denied his narcotic medications and provided ineffective non-narcotic drugs in lieu of his pre-incarceration prescription, causing him to suffer from his chronic pain disorder. Such pain and suffering, as plaintiff maintains, violates the Eighth Amendment's proscription of cruel and unusual punishment and, ultimately, constitutes deliberate indifference to his serious medical needs.

"'The failure to provide proper medical treatment to a prisoner violates the eighth amendment when the medical provider is deliberately indifferent to the prisoner's medical needs.'" Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006) (citing Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)). "To prevail on an Eighth Amendment claim of deliberate indifference to serious medical needs, an inmate must prove that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs." Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999). "'A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity of a doctor's attention.'" Phillips, 437 F.3d at 795 (following Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). Deliberate indifference may be shown by prison officials "'who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'" Roberson, 198 F.3d at 647 (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (following Estelle v. Gamble, 429 U.S. 97, 104-06, 97 S. Ct. 285, 291-92, 50 L. Ed. 2d 251 (1976))). See Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S. Ct. 2321, 2323-24, 115 L. Ed. 2d 271 (1991). Moreover, "'disagreement with treatment decisions does not rise to the level of a constitutional violation.'" Phillips, 437 F.3d at 795; Jolly, 205 F.3d at 1096 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)).

There is no dispute that plaintiff suffers from an objectively serious medical need – a chronic pain disorder stemming from a severe injury to his left arm – which was diagnosed and

treated by Dr. Burnap with the implementation of narcotic pain medications. It is further undisputed that defendant Weber and the prison staff knew of plaintiff's malady. Therefore, the question then becomes whether defendant Weber and the prison doctors have deliberately disregarded plaintiff's serious and known medical problem. However, taking the facts in a light most favorable to plaintiff, there is no genuine issue of material fact indicating that defendant Weber and the prison staff were deliberately indifferent to plaintiff's medical needs.

Upon plaintiff's admission into the South Dakota State Penitentiary, prison staff inquired about plaintiff's prescription with Dr. Regier. Dr. Regier instructed the staff members to withhold the administration of plaintiff's pain medications until he underwent an admission physical. At that point, plaintiff was placed in the infirmary to allow prison staff to observe whether plaintiff experienced withdrawal symptoms or problems. On July 29, 2005, the day after plaintiff's incarceration, Dr. Regier conducted a physical of plaintiff. During the physical, Dr. Regier discussed the use of non-narcotic drugs with plaintiff, noted the unusually high dosage of plaintiff's medication, and prescribed a separate, non-narcotic pain reliever for plaintiff's use. According to Dr. Regier's August 3 observations, plaintiff demonstrated little to no withdrawal symptoms while placed in the prison infirmary. Dr. Regier also provided plaintiff with another non-narcotic prescription, since plaintiff indicated the first pain reliever caused him to experience "nervous" side effects.

On August 29, 2005, plaintiff met with another prison physician, Dr. Saloum. Dr. Saloum noted that plaintiff's previous narcotic prescriptions were "exorbitant," among other things, and prescribed plaintiff to another non-narcotic medication to help alleviate his condition.

Plaintiff was subsequently referred to an anesthesiologist, Dr. Lockwood, who also evaluated plaintiff and treated him with a stellate ganglion block.

On February 13, 2006, plaintiff was examined by Dr. Luther, the medical director for correctional health care. Dr. Luther concluded that plaintiff's pre-incarceration prescriptions were excessive and medically unnecessary, especially in light of Dr. Luther's observations that plaintiff's previously injured limb exhibited good range of motion and that there was no evidence of dystrophic changes.

Two months later, on April 12, 2006, a neurologist administered a nerve-conduction study on both of plaintiff's arms. After reviewing the results of this study, plaintiff was prescribed two different non-narcotic medications by Dr. Saloum on April 17, 2006. However, on May 8, plaintiff indicated that neither drug was working and refused to allow Dr. Saloum to examine him. In the interim periods between plaintiff's examinations with the various prison doctors, the record indicates that plaintiff was taking either Motrin, Tylenol, Tylenol Extra Strength, or a combination of the three pain relievers. The record also demonstrates that while there may have been times plaintiff was not taking any form of pain medication, it was due to his refusal to take the prescription or disagreement with the treating physician.

Under these facts, the Court concludes that plaintiff fails to show defendant Weber and the penitentiary doctors have deliberately disregarded plaintiff's serious medical needs. To the contrary, plaintiff has been provided ample medical care, while giving credence to plaintiff's state court judgment of providing him, "to the extent possible," with a pain management regime. Plaintiff has provided no evidence beyond his conclusory allegations and his doctor's letter and publication to get past summary judgment. Although plaintiff and his previous doctor, Dr.

Burnap, disagree with the Department of Corrections' refusal to allow inmates to use narcotic pain medications, "'mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" Phillips, 437 F.3d at 795; Jolly, 205 F.3d at 1096 (quoting Rosenberg, 56 F.3d at 37). Plaintiff's conclusory assertions and differences of opinion are insufficient to create a material issue of fact. See Jones v. Norris, 310 F.3d 610, 612 (8th Cir. 2002). As such, without a violation of a constitutional or statutory right, plaintiff's cause of action cannot survive the affirmative defense of qualified immunity. Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. The motion for summary judgment is therefore granted as to plaintiff's first cause of action.

### C.  Due Process Violation:  Confiscation of Inmate Account Funds

Plaintiff argues that because he was never notified of the Department of Corrections' account policy, his due process rights were violated when his inmate account funds were confiscated to payoff his obligations and the cost of incarceration. He maintains that he was not provided an explanation of the account policy upon admission to the penitentiary, due to his immediate placement in the infirmary.

Pursuant to 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act, however, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available are exhausted.*" Id. (1996) (emphasis added). Section 1997e(a) mandates that "the inmate exhaust all available prison grievance remedies as to all of his claims prior to filing suit in federal court." Abdul-Muhammad v. Kempker, 450 F.3d 350, 352 (8th Cir. 2006) (citing Graves v. Norris, 218 F.3d 884, 885 (8th Cir. 2000)). If all

available administrative remedies have not been exhausted, dismissal of the complaint is required. Id.

In this case, although plaintiff declared in his complaint that he "filed grievances," (compl. attach. 1B), the only submissions on the record were that of informal resolution requests, (Wynia's aff. at 2-3, ex. D & ex. E). A review of the Department of Corrections' exhaustion procedure supports a finding that plaintiff failed to pursue all of the available administrative avenues prior to filing this cause of action, since there were only informal resolution requests on record and nothing to demonstrate that plaintiff took the next administrative step. (Id. at Ex. A, Ex. D & Ex. E.) In the face of this evidentiary backing, plaintiff nevertheless fails to rebut defendant Weber's affidavits and exhibits, thereby succumbing to Federal Rule of Civil Procedure 56(e)'s burden placed on the non-moving party after a motion for summary judgment has been adequately presented. Plaintiff posits that he was unaware of the grievance procedure, but this assertion is disingenuous. Plaintiff's complaint, admissions, and other administrative remedy requests accompanying his first claim all demonstrate that he was fully cognizant of the prison's grievance policy.

Moreover, even if plaintiff exhausted all of his administrative remedies, plaintiff's action challenging the penitentiary's account policy is without merit and fails as a matter of law. See Jones, 310 F.3d at 612 (dismissing as frivolous an inmate's claim even when all administrative remedies had not been exhausted). South Dakota law provides, in pertinent part, that "[e]ach inmate under the jurisdiction of the Department of Corrections is liable for the cost of the inmate's confinement which includes room and board charges; medical, dental, optometric, and psychiatric services charges; vocational education training; and alcoholism treatment charges."

14

S.D. CODIFIED LAW § 24-2-28 (2004). Each inmate is also "liable for court-ordered fines, costs, fees, sanctions, and restitution and any obligation incurred while under the jurisdiction of the Department of Corrections including those provided for in §§ 24-2-28, 24-7-3, 24-8-9, 24-11A-19, 24-15-11, 24-15A-24, and 23A-35B-4 and any other charge owed to the state." S.D. CODIFIED LAW § 24-2-29 (2004). Finally, "[d]isbursement shall be made from an inmate's institutional account to defray the inmate's obligation, regardless of the source of the inmate's funds, including moneys in the inmate's institutional account pursuant to § 24-2-5 and wages earned by the inmate pursuant to §§ 24-4-9, 24-7-3(3), 24-7-6, 24-8-8, and 24-11A-20." Id. Thus, for these reasons, plaintiff's second cause of action is meritless and dismissed with prejudice.

## IV. CONCLUSION

In a nutshell, plaintiff disagrees with his medical treatment. Mere disagreements and differences of opinion concerning medical treatment, however, do not amount to a constitutional violation. As to his due process claim, plaintiff failed to exhaust his administrative remedies and this action fails as a matter of law. Plaintiff's second cause of action is therefore dismissed with prejudice. Accordingly, it is hereby

ORDERED that defendant Douglas Weber's motion for summary judgment (Docket #19) is granted as to plaintiff Alan Clyde Steele's first claim of his complaint.

IT IS FURTHER ORDERED that plaintiff Alan Clyde Steele's second cause of action is dismissed with prejudice.

IT IS FURTHER ORDERED that plaintiff Alan Clyde Steele's motion for issuance of subpoenas (Docket #35) is moot.

Judgment is issued in favor of defendant Douglas Weber as to all of plaintiff Alan Clyde Steele's claims.

Dated this 8th day of December, 2006.

BY THE COURT:

/s/ Richard H. Battey
RICHARD H. BATTEY
UNITED STATES DISTRICT JUDGE